# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION

### Case No. 5:20-CV-0070

| | |
|---|---|
| **SUNBELT RENTALS, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **MICHAEL GUZMAN, JESSICA** ) | **VERIFIED COMPLAINT** |
| **GUZMAN, and SECOND LIFE** ) | |
| **EQUIPMENT, LLC** ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

Plaintiff Sunbelt Rentals, Inc. ("Plaintiff" or "Sunbelt") complaining of Defendants Michael Guzman ("Guzman"), Jessica Guzman ("Jessica Guzman"), and Second Life Equipment, LLC ("Second Life") (collectively, the "Defendants") alleges and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a North Carolina corporation with its principal place of business located in Fort Mill, South Carolina. Plaintiff is registered to do business in North Carolina. Plaintiff is in legal existence in good standing with the capacity to sue.

2. Defendant Guzman is a citizen and resident of Lincoln County, North Carolina. Defendant Guzman can be served with process at 7954 Bay Pointe Drive, Denver, North Carolina 28037.

3. Defendant Jessica Guzman is a citizen and resident of Lincoln County, North Carolina. Defendant Jessica Guzman can be served with process at 7954 Bay Pointe Drive, Denver, North Carolina 28037.

4. Defendant Second Life is a North Carolina limited liability company with its

principal place of business located in Denver, North Carolina.  Defendant Second Life can be served with process at 3593 Denver Drive, Suite 1361, Denver, North Carolina 28037.

5.      Pursuant to 28 U.S.C. §1331, jurisdiction is proper in this Court as this action arises under the Constitution, laws, or treaties of the United States.

6.      Pursuant to 28 U.S.C. §1391, venue is proper in this Court because Defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTS

### I.   Sunbelt and Guzman

7.      Sunbelt is a rental company that offers various products including but not limited to general construction equipment, industrial tools, pumps, power generation, climate control & HVAC, shoring solutions, scaffolding, and remediation and restoration equipment.

8.      Guzman began his employment with Sunbelt on or about March 31, 2008 as Regional Financial Manager.

9.      On May 23, 2016, Guzman was promoted to the position of Manager of Fleet Operations, which was a part of Sunbelt's Fleet Group.  At all times, Guzman worked out of Sunbelt's Fort Mill, South Carolina headquarters.

10.     Sunbelt's Fleet Group, among other things, purchases equipment, maintains equipment, and disposes of equipment.

11.     Following Guzman's years of service to Sunbelt, and his promotion to the Fleet Operations Manager role, Sunbelt trusted Guzman in the execution of his duties.

12.     As a Manager of Fleet Operations, Guzman was responsible for the disposal of assets that are identified by the Fleet Group for disposal in the ordinary course of business.

13.     In his role, Guzman was the primary contact for various auction houses, as well as with Sunbelt's vendors through which Sunbelt disposed used equipment through trade packages.

14.     Sunbelt relied on Guzman to act in Sunbelt's best interests, and to properly manage the business relationships with the auction houses and vendors.

## II.     The Formation of Second Life

15.     Second Life was formed on July 10, 2019.  Guzman and his wife, Jessica Guzman executed Second Life's Articles of Organization, identifying them both as Members and Jessica Guzman as President.

16.     Second Life's Articles of Organization state that it has no principal place of business.

17.     On or about June 28, 2019, Jessica Guzman established a customer account for Second Life with Sunbelt, listing its address as 7954 Bay Pointe Drive, Denver, North Carolina 28037 and with Jessica Guzman as guarantor.

18.     Guzman did not inform his Sunbelt supervisors that he had formed Second Life, and he did not inform his supervisors that Second Life was purchasing products from Sunbelt.

19.     Guzman's formation of Second Life and Second Life's purchases violate Sunbelt's conflict of interest policy, which prohibits, among other things, transactions between Sunbelt and any person or entity that the employee has any ownership interest in or that he or she can exercise any influence over.

20.     Initially, Second Life made a small number of inexpensive purchases from Sunbelt, primarily consisting of small tools, which were paid for by credit cards.

21.     In or around February of 2020, a request was made to Sunbelt's Accounts Receivable department to change the name of Second Life to All Seasons Sales & Service in

Sunbelt's accounting systems and to increase the credit limit.

22.     The request was for a name change, but the federal tax identification provided was same as Second Life's.  The address provided on the request is the same registered address for Second Life, 3593 Denver Drive, Suite 1361, Denver, North Carolina 28037.  This address is, in fact, the location of a United States Post Office.

23.     The North Carolina Secretary of State has no listing for All Seasons Sales & Service.

24.     Upon information and belief, Defendants used All Seasons Sales & Service, a sham corporation, to divert attention from and hide their fraudulent activities conducted through Second Life.

## III.     Guzman Fraudulently Involves Second Life in Sunbelt's Business Dealings.

25.     During this same time period, Guzman introduced Second Life to Bidadoo, Inc. ("Bidadoo").

26.     Bidadoo is an online auction company that had a pre-existing business relationship with Sunbelt.

27.     Sunbelt regularly engages auction houses such as Bidadoo, as part of its equipment disposal process, which would then auction the equipment, including through its website, www.bidadoo.com.

28.     On or about June 27, 2019, Guzman approached Bidadoo and falsely represented that Sunbelt was selling equipment to Second Life, and Second Life was looking for auction platforms such as Bidadoo to in turn sell the equipment for Second Life's benefit.

29.     Upon information and belief, unbeknownst to Bidadoo, no vendor business relationship existed between Sunbelt and Second Life, and Sunbelt never engaged Second Life to

resell equipment.

30. Defendants had no ownership interest in any of the equipment that Second Life was selling through Bidadoo, and accordingly had no right or interest in the proceeds.

31. Based on the false representations, Bidadoo proceeded to engage in a business relationship with Second Life on or about July 8, 2019.

32. Second Life proceeded to provide Bidadoo with information about Sunbelt's equipment, which Bidadoo auctioned to third parties.

33. Bidadoo remitted the net proceeds less Bidadoo's commission to Second Life by wire to Wells Fargo as instructed by Defendants.

34. The address provided to Wells Fargo for Second Life is Guzman and Jessica Guzman's home address, 7954 Bay Pointe Drive, Denver, North Carolina 28037.

35. Sunbelt was entirely unaware that the asset list that Defendants' provided to Bidadoo were being sold by Bidadoo and that Bidadoo was remitting proceeds to Second Life for the purchase of Sunbelt's assets.

36. The amount of proceeds remitted by Bidadoo to Second Life was in excess of $4,000,000.

37. Upon information and belief, Guzman and Jessica Guzman formed Second Life for the purpose of defrauding Sunbelt by misrepresenting to companies, such as Bidadoo, that Sunbelt sold its equipment to Second Life which was acting as a "middle man" or broker for disposing equipment.

38. Through Defendants' fraudulent scheme, they obtained the proceeds for equipment rightfully owned by Sunbelt.

## IV. Guzman's Manipulation of Sunbelt's Financial Records

39. In Sunbelt's financial records, the assets that Second Life sold through Bidadoo were recorded as being sold to certain other Sunbelt's vendors as part of a trade package.

40. Guzman fraudulently altered Sunbelt's financial records to appear that the assets were to be sold pursuant to other Sunbelt vendors pursuant to a vendor trade package. This was done to avoid detection that these assets were actually sold by Second Life through Bidadoo.

41. For example, Sunbelt's financial records indicate that one vendor trade account, JCB Co., Ltd. ("JCB"), reflected disposal activity resulting in approximately $6,000,0000 in accounts receivable.

42. Sunbelt's vendor trade partners, including JCB, have no record of purchasing these assets and were unaware of the accounts receivable in their names.

## V. Guzman's Fraudulent Issuance of Credit Memos to Sunbelt's Vendors.

43. If trade vendors are not satisfied with the condition of the asset, Sunbelt traditionally offers to credit a portion of the sale. These credits are often reflected in written documents called credit memos.

44. In or around April of 2020, multiple credit memos were written and applied to JCB's accounts receivable which reduced the apparent accounts receivable from approximately $6,000,000 to approximately $3,200,000. None of these amounts was owed by JCB.

45. Upon information and belief, Guzman created and applied credits to JCB's account in order to avoid detection and discovery of his fraudulent scheme with Second Life.

46. Upon information and belief, Guzman fraudulently moved JCB's false accounts receivable balance to other accounts to avoid detection and discovery of Defendants' scheme described herein.

47. During this time period, the Sunbelt accounting department questioned Guzman regarding the aging of certain trade packages receivables and the issuance of credit memos.

48. It is Sunbelt's standard practice for credit memos to reference or link to an original invoice.

49. However, all of Guzman's credit memos did not reference or link to an original invoice.

50. Guzman's credit memos were discovered by Sunbelt's Director of Credit Services who promptly escalated this information to Sunbelt's Assistant Controller.

51. On or around May 6, 2020, Sunbelt's Controller and Assistant Controller had a conversation with Guzman regarding his irregular credit activity.

52. Guzman stated that JCB was displeased with the condition of assets and was not willing to pay the invoices. Guzman stated that he was unsure what portion of the price JCB was willing to pay for the invoices, and therefore he opted to credit the entire sales amount.

53. Upon further investigation by Sunbelt's Senior Vice President of Finance, it was determined that Guzman's credits were for the full invoice amount of the asset disposal and were charged against various unrelated expense accounts (for example, supplies, repairs, miscellaneous expenses), rather than the proceeds on sales of the used equipment account, which is Sunbelt's standard practice.

54. Sunbelt also discovered other instances of credit memos issued in a similar fashion of approximately $750,000 in value.

55. In connection with his credit memos, Guzman altered the equipment asset numbers and serial numbers in Sunbelt's system and altered a valid credit memo remittance detail provided by JCB in order to misrepresent what equipment JCB was purchasing from Sunbelt.

56. JCB informed Sunbelt that it had no knowledge of the specifically identified asset sales, and JCB had no conversations with Guzman regarding equipment condition.

**VI. Sunbelt's Attempted Meeting with Guzman and Guzman's Visits to Stores.**

57. On May 20, 2020, Sunbelt scheduled a meeting with Guzman to review these transactions in question. However, Guzman failed to attend the meeting, claiming that he was seeking medical attention for a potential substance abuse problem, and would be using PTO for the next few days.

58. The following day, Sunbelt received reports that an individual was visiting Sunbelt store locations in Central Florida.

59. The individual, while wearing a hospital mask, used different names of actual employees of Sunbelt's Support Center and was inquiring about the disposals and processes that stores go through and any documentation that is retained. The individual stated that Sunbelt's Support Center is attempting to digitize the system and wants to better understand the current processes.

60. Shortly thereafter, Guzman attempted to visit another Sunbelt store. The store manager asked for Guzman's identification or a business card, which Guzman claimed was in his vehicle. Guzman returned to his vehicle using the pretense of retrieving his identification, but instead, proceeded to leave the premises.

61. After the stores sent video and pictures of the individual, Support Office personnel whom knew Guzman identified the individual as Guzman.

62. Following the discovery of Guzman's impersonation visits to the Sunbelt stores in Florida, Guzman's access to Sunbelt computer systems and headquarter facilities was revoked.

**VII. Defendants' Fraudulent Scheme**

8

63. Defendants engaged in an elaborate scheme to defraud Sunbelt by selling Sunbelt equipment for the sole benefit of Defendants.

64. Defendants deceived Sunbelt by representing that on various transactions the equipment had been purchased by trade package vendors and the proceeds reflected as such in receivables to Sunbelt when, in fact, the proceeds were directed to Second Life.

65. Guzman, on behalf of himself and the other defendants, deceived Sunbelt by fraudulently altering Sunbelt's financial records to appear that assets were sold pursuant to a vendor trade package agreement. In actuality, the assets were represented to Bidadoo as being owned by Second Life, for Second Life sell and to receive the proceeds.

66. Defendants defrauded Sunbelt in excess of $4,000,000.

67. Defendants have not repaid Sunbelt the funds in excess of $4,000,000 that they obtained through the fraudulent scheme.

**FIRST CLAIM FOR RELIEF**
**(North Carolina Civil liability for larceny, shoplifting, theft by employee, embezzlement, and obtaining property by false pretense - N.C. Gen. Stat. § 1-538.2)**
*Michael Guzman*

68. Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

69. Sunbelt was the owner of all of Sunbelt's equipment, and all proceeds derived therefrom.

70. As Manager of Fleet Operations, Guzman was entrusted to sell Sunbelt's equipment through auction houses and trade package vendors. Guzman was expected to act in Sunbelt's best interests and to return all profits to Sunbelt.

71. Guzman knowingly and willfully took and embezzled Sunbelt's equipment, and the proceeds derived therefrom, for his own use, with the purpose of embezzling and stealing the

proceeds from the equipment sale and defrauding Sunbelt of the same.

72. Guzman's theft and embezzlement violated N.C. Gen. Stat. §§ 14-74 and 14-90.

73. As a direct and proximate result of Guzman's theft and embezzlement, Sunbelt has suffered damages.

74. Pursuant to N.C. Gen. Stat. § 1-538.2(a), Sunbelt pleads for and is entitled to recover consequential damages in an amount to be proven at trial and its reasonable attorneys' fees in connection with Guzman's theft and embezzlement as well as a constructive trust over all funds and assets derived from Guzman's illicit acts.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Unjust Enrichment)**
***All Defendants***

75. Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

76. In connection with the fraudulent scheme, Defendants misappropriated Sunbelt's property for their own commercial and personal benefit. Defendants received funds due and owing to Sunbelt by re-directing the proceeds from the sale of Sunbelt's equipment to Second Life.

77. Defendants are not and were not entitled to use or sell Sunbelt's property.

78. A non-gratuitous benefit has been conferred on and accepted by Defendants, thereby injuring Sunbelt.

79. Consequently, Defendants were unjustly enriched at the expense of Sunbelt, and Defendants are not, therefore, entitled to retain any of these moneys. Sunbelt is entitled to full compensation by Defendants for such unjust enrichment, including disgorgement of all profits obtained by Defendants from such acts.

## THIRD CLAIM FOR RELIEF
### (Fraud)
### *All Defendants*

80.     Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

81.     While employed by Sunbelt, Guzman was responsible for selling Plaintiff's disposed equipment through auction houses and trade package vendors.

82.     Guzman and Jessica Guzman formed Second Life for the purpose of defrauding Sunbelt by misrepresenting to companies, such as Bidadoo, that Sunbelt brokered its equipment through Second Life, which was acting as an intermediary for disposing equipment through auction houses and trade package vendors.

83.     Guzman fraudulently altered Sunbelt's financial records to appear that assets were sold pursuant to a vendor through a trade package agreement.  In actuality, the assets were represented to Bidadoo as being owned by Second Life, for Second Life to sell and receive the proceeds.

84.     Defendants' false representations were material because Second Life represented itself to be a legitimate intermediary of Sunbelt that was entitled to the proceeds from the sale of the equipment.

85.     Defendants' fraudulent actions were material because Sunbelt was led to believe its accounting records reflected equipment sold in trade packages when in fact the equipment had already been sold via Bidadoo's online auction and the proceeds remitted to the Defendants.

86.     Defendants' false representations and concealments, as described herein, were reasonably calculated to deceive Sunbelt and were made with the intent of deceiving Sunbelt.

87.     Defendants' false representations and concealments, as described herein, did in fact

deceive Sunbelt as Sunbelt believed that Guzman was legitimately selling disposed equipment through auction houses and trade package vendors on behalf of Sunbelt, and that Sunbelt's financial entries were accurate.

88.     Sunbelt reasonably relied on Defendants' representations.

89.     As a direct and proximate result of Defendants' fraud, Sunbelt has suffered actual damages in an amount to be proven at trial.

90.     Defendants' actions as described herein were intentional, malicious, willful, and wanton, and were done with reckless disregard for Sunbelt's rights.  Sunbelt is therefore entitled to recover actual and punitive damages from Defendants in an amount to be proven at trial.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Fraudulent Concealment)**
*All Defendants*

91.     Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

92.     While employed by Sunbelt, Guzman was responsible for selling Sunbelt's disposed equipment through auction houses and trade package vendors.

93.     Guzman and Jessica Guzman formed Second Life for the purpose of defrauding Sunbelt by misrepresenting to companies, such as Bidadoo, that Sunbelt was brokering certain equipment to Second Life, which was acting as an intermediary for disposing of equipment through auction houses and trade package vendors.

94.     Guzman fraudulently altered Sunbelt's financial records to appear that assets were sold pursuant to a trade package vendor agreement.  In actuality, Defendants provided the list of assets to Bidadoo for sale and Second Life received the proceeds.  Therefore, Guzman concealed his fraudulent activity.

95. Defendants' fraudulent concealment was material because Sunbelt was led to believe the fraudulently altered accounting records represented legitimate sales under the vendor trade package agreements.

96. Defendants' false representations and concealments, as described herein, were reasonably calculated to deceive Sunbelt and were made with the intent of deceiving Sunbelt.

97. Defendants' false representations and concealments, as described herein, did in fact deceive Sunbelt as Sunbelt believed that Guzman was legitimately selling disposed equipment through auction houses and to trade package vendors on behalf of Sunbelt, and that Sunbelt's financial entries were accurate.

98. Sunbelt reasonably relied on Defendants' representations.

99. As a direct and proximate result of Defendants' fraud, Sunbelt has suffered actual damages in an amount to be proven at trial.

100. Defendants' actions as described herein were intentional, malicious, willful, and wanton, and were done with reckless disregard for Sunbelt's rights. Sunbelt is therefore entitled to recover actual and punitive damages from Defendants in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Conversion)
### *All Defendants*

101. Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

102. Sunbelt's equipment was purchased by Sunbelt.

103. Sunbelt is the rightful owner of the equipment and any proceeds derived therefrom.

104. Defendants wrongfully converted Sunbelt's equipment when Second Life proceeded to dispose of the equipment through Bidadoo, and Bidadoo remitted the net proceeds

less Bidadoo's commission to Second Life, rather than to Sunbelt.

105.    Defendants have, without authorization, assumed and exercised the right of ownership over Sunbelt's equipment, and the proceeds derived therefrom, to the exclusion of and inconsistent with Sunbelt's rights.

106.    As a direct and proximate result of Defendants' conversion, Sunbelt has been damaged and is entitled to recover and seek recovery of such damages as it proves at trial.

## SIXTH CLAIM FOR RELIEF
### (Unfair and Deceptive Trade Practices and Competition- N.C. Gen. Stat. § 75-1.1, *et seq.*)
### *All Defendants*

107.    Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

108.    Pursuant to the common law, N.C. Gen. Stat. § 75-1.1, and § 75-16, the conduct of Defendants with regard to the unlawful transfer of Sunbelt's property, as set forth in this Complaint, constitutes an unfair method of competition and unfair or deceptive acts or practices in and affecting commerce, which has injured and will continue to injure the goodwill and business of Sunbelt.

109.    Defendants' conduct, as set forth herein, is immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and without any legitimate or proper purpose.

110.    Defendants deceived Sunbelt by fraudulently altering or causing alteration to Sunbelt's financial records to appear that assets were sold pursuant to vendor trade package agreements.  In actuality, Defendants provided the list of assets to Bidadoo for sale, and Second Life received the proceeds.

111.    Defendants lacked requisite authority to transfer sole control over Sunbelt's equipment, or the proceeds derived therefrom, to themselves.

112.    As a direct and proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices, Sunbelt has suffered actual damages in an amount to be determined at trial.

113.    Further, pursuant to the common law, N.C. Gen. Stat. § 75-1.1, and § 75-16, Sunbelt is entitled to recover and seek recovery from Defendants of such damages as it may prove at trial and to have those damages trebled.  Sunbelt is also entitled to and seek recovery of its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**(Violations of the North Carolina Racketeer Influence and Corrupt Organizations Act -
N.C. Gen. Stat. § 75D- ("NC RICO Act"))**
*All Defendants*

114.    Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

115.    Defendants participated in and/or conspired to commit activities in violation of N.C. Gen. Stat. § 75D.

116.    Each Defendant is a "person" within the meaning of the NC RICO Act, N.C. Gen. Stat. § 75D-1, *et seq*.

117.    At all times relevant hereto, without Sunbelt's knowledge, Defendants combined and conspired to form an ongoing organization and "enterprise" within the meaning of N.C. Gen. Stat § 75D-3(a), the purpose of which was to defraud Sunbelt out of millions of dollars.

118.    During the relevant times, in connection with the activities giving rise to this action, Defendants conspired with each other to engage in, and did engage in, various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by N.C. Gen. Stat. §§ 14-71, 14-74, 14-90, and 14-100.

119.    The acts of receiving stolen goods, embezzlement, theft by an employee, and

obtaining property by false pretenses constitute acts of "racketeering activity" within the meaning of N.C. Gen. Stat. § 75D-3(c).

120. The racketeering activity describe hereinabove occurred repeatedly, continuously, and without interruption from approximately July of 2019 until May of 2020.

121. The acts of racketeering activity alleged above have sufficient continuity and relationship to constitute a "pattern of racketeering activity" within the meaning of N.C. Gen. Stat. § 75D-3(b).

122. The acts of embezzlement and theft by an employee perpetrated by Defendants upon Sunbelt constituted a pattern of racketeering activity consisting of more than two acts of racketeering activity.

123. Defendants have through the pattern of racketeering activity referred to herein acquired or maintained an interest or control of the enterprise, in violation of N.C. Gen. Stat. § 75D-4(a)(1).

124. Defendants participated in and conducted the enterprise through the above-described pattern of racketeering activity in violation of N.C. Gen. Stat. § 75D-4(a)(2).

125. Defendants agreed and conspired among themselves to violate N.C. Gen. Stat. § 75D-4(a)(1) and (2) in violation of N.C. Gen. Stat. § 75D-4(a)(3).

126. The violations of N.C. Gen. Stat. § 75D-4(a)(1), (2), and (3) have proximately caused Sunbelt injury and harm in an amount to be determined at trial.

127. In accordance with N.C. Gen. Sta. § 75D-8(c), Sunbelt, concurrently with the filing of this Complaint, will notify the Attorney General of North Carolina in writing of the commencement of this action.

# EIGHTH CLAIM FOR RELIEF
## (Violations of the Racketeer Influence and Corrupt Organizations Act - 18 U.S.C. §§ 1961, *et seq.* ("RICO Act"))
### *All Defendants*

128. Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

129. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d) of the RICO Act.

130. Defendants combined and conspired to form an ongoing organization and "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), the purpose of which was to defraud Sunbelt out of millions of dollars.

131. The enterprise engaged in, and its activities affected, interstate commerce. The enterprise and its activities thereby affected interstate commerce within the meaning of 18 U.S.C. § 1962(c). Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia,* by misrepresenting or causing misrepresentation to Bidadoo that Second Life served as an intermediary for Sunbelt, and that all equipment proceeds should be directed to Second Life, and by deceiving Sunbelt through fraudulently altering or causing alteration to Sunbelt's financial records to appear that assets were sold pursuant to a vendor trade package agreement. In actuality, the list assets were provided to Bidadoo for sale and Second Life received the proceeds.

132. As part of this pattern, continuing over the course of approximately one year, by using interstate wire communications, Defendants through their enterprise, defrauded Sunbelt during the period between approximately July of 2019 until May of 2020, in violation of 18 U.S.C. § 1343.

133. Defendants' conduct, as set forth herein, was planned and pre-arranged with and

known by each of the Defendants pursuant to the enterprise's common scheme to defraud Sunbelt by misrepresenting to customers that Second Life served as an intermediary for Sunbelt, and that all equipment proceeds should be directed to Second Life.

134. Defendants' conduct violated 18 U.S.C. §§ 1962(c) and 1962(d).

135. As a direct and proximate result of the foregoing conduct by Defendants, Sunbelt has been damaged and suffered substantial injury within the meaning of 18 U.S.C. § 1964(c).

136. Each Defendant is jointly and severally liable to Sunbelt for the foregoing RICO violations, and treble damages and reasonable attorneys' fees are demanded in accordance with 18 U.S.C. § 1964(c).

## NINTH CLAIM FOR RELIEF
### (Alter Ego/Piercing the Corporate Veil)

137. Sunbelt realleges and incorporates by reference the allegations of all prior and subsequent paragraphs of this Complaint.

138. Upon information and belief, at all times relevant to the matters described herein, Guzman and Jessica Guzman exercised complete dominion and control over Second Life such that Second Life did not have a separate mind, will, or existence of its own.

139. Upon information and belief, at all times relevant to the matters described herein, Guzman and Jessica Guzman use and operate Second Life as a mere instrumentality and Second Life existed as a mere façade for the operations of Guzman and Jessica Guzman.

140. Guzman and Jessica Guzman used their dominion and control over Second Life to commit fraud and violate legal duties that proximately caused damages to Sunbelt.

141. Guzman and Jessica Guzman are alter egos of Second Life and are therefore liable to the same extent as Second Life for all the claims asserted in this action.

142. Defendants are therefore jointly and severally liable for the damages suffered by

Sunbelt.

143.     Defendants willfully, intentionally and maliciously committed the acts described herein.

144.     As a direct and proximate result of the foregoing, Sunbelt been substantially damaged and is entitled to a judgment against Defendants, jointly and severally, in an amount in to be proven at trial, plus interest, attorneys fees and punitive damages as allowed by law.

WHEREFORE, Plaintiff respectfully prays that:

1.     The Court enter judgment against Defendants in the amount of damages as may be proven at trial, including punitive damages, as set forth in Claims for Relief.

2.     The Court treble the compensatory damages awarded with respect to the Sixth Claim for Relief, pursuant to N.C. Gen. Stat. §75-16.

3.     The Court award Plaintiff its attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1 and other applicable law.

4.     The Court disregard the corporate entity of Second Life, and hold Guzman and Jessica Guzman individually liable;

5.     The Court tax the cost of this action against Defendants.

6.     For trial by jury on all issues so triable.

7.     The Court grant Plaintiff such other and further relief as it deems just and appropriate.

Dated: May 29, 2020

                                               **SUNBELT RENTALS, INC.**

                                               **By its attorneys,**

                                               s/ Jami Jackson Farris
                                               Jami Jackson Farris (N.C. Bar No. 26915)
                                               Eric A. Frick (N.C. Bar No. 49212)
                                               **PARKER POE ADAMS & BERNSTEIN LLP**
                                               401 S. Tryon St., Suite 3000
                                               Charlotte, NC 28202
                                               Tel: (704) 372-9000
                                               Fax: (704) 334-4706
                                               jamifarris@parkerpoe.com
                                               ericfrick@parkerpoe.com

# **VERIFICATION**

The undersigned, <u>Brad Lull</u>, being first duly sworn, deposes and says that he is the <u>Executive Vice President of Central Operations</u> of Sunbelt Rentals, Inc. in this action; that as such he has personal knowledge of the business and is authorized to make this oath and verification; that he has read the foregoing complaint and the same is true and correct of his own personal knowledge or from information provided to him by employees or agents of Sunbelt Rentals, Inc., except as to those allegations made upon information and belief, and as to those allegations he believes them to be true.

Brad Lull

STATE OF SOUTH CAROLINA   )
   )
COUNTY OF YORK )

I, <u>Stephanie L. Ransone</u>, a Notary Public of <u>York</u> County, State of <u>South Carolina</u> that <u>Brad Lull</u> (the "Signatory"), appeared before me this day and that he, being authorized to do so, acknowledged the execution of the foregoing instrument.

I certify that the Signatory personally appeared before me this day, and
*(check one of the following)*

    ✓ (I have personal knowledge of the identity of the Signatory); **or**

    (I have seen satisfactory evidence of the Signatory's identity, by a current state or federal identification with the Signatory's photograph in the form of:

    *(check one of the following)*

         a driver's license *or*

         in the form of _____ ); **or**

         (a credible witness has sworn to the identity of the Signatory).

Sworn to and subscribed before me this the 27th day of May , 2020.

_____
Notary Public

Print Name: _____

My Commission Expires: _____

    [NOTARY SEAL]    **(MUST BE FULLY LEGIBLE)**

Stephanie L. Ransone
NOTARY PUBLIC
State of South Carolina
My Commission Expires 11/21/2023

PPAB 5639092v5

20